[Cite as *Gregory v. Cuyahoga Cty.*, 2020-Ohio-2714.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

RAQUEL GREGORY,                          :

    Plaintiff-Appellee,                  :

  v.                                       :          No. 108192

CUYAHOGA COUNTY,                         :

    Defendant-Appellant.                 :

_____

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** April 30, 2020
_____

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-17-882718
_____

### *Appearances:*

Mansour Gavin L.P.A., and James A. Budzik, *for appellee.*

Nora Hurley, Interim Cuyahoga County Director of Law, and Amy E. Marquit Renwald, Assistant Director of Law, *for appellant.*

SEAN C. GALLAGHER, P.J.:

{¶ 1} Cuyahoga County appeals the trial court's conclusion that there was a lack of substantial, reliable, and probative evidence supporting Raquel Gregory's

termination from her position as a supervisor within the county fiscal office. The crux of Gregory's removal focused on two particular claims: (1) that Gregory mismanaged, and failed to adequately execute, her duties to supervise the processing and updating of data within the dog license database (under the parlance of the county's policy, this mismanagement supported Gregory's removal for egregious, flagrant, or willful neglect in the performance of assigned duties and failing to complete legitimate job assignments); and (2) that Gregory failed to follow the required call-in procedures on two consecutive days. The first was considered a "removable infraction," while the second was considered a "major infraction" according to the unambiguous terms of the county's policy and procedures manual. The removal was also, in part, supported by the fact of Gregory's consistent failure to read communications sent through the county email system, which according to the hearing officer's conclusion, supported the charge of egregious, flagrant, or willful neglect of legitimate job assignments. The Cuyahoga County Personnel Review Commission (the "Commission") affirmed the employer's termination decision through the adoption of the thorough report and recommendation prepared by the hearing officer.

### Hearing Officer's Findings of Fact

{¶ 2} Gregory worked for the county in various capacities for 23 years. In January 2008, she was promoted to director of General Services. Following the change in the county's governmental structure in 2009, through voter-approved amendments to the county's charter, Gregory was reclassified into her most recent

position of Fiscal Office supervisor. Her direct supervisor was Bonnie Innis. One of Gregory's primary areas of responsibility was to manage employees in the maintenance and processing of the annual dog licensing program for Cuyahoga County. The dog licensing program issues and renews the most licenses and generates the highest cash proceeds of all the licenses over which the Fiscal Office has responsibility.

{¶ 3} The dog license registration process occurs every year between December 1 and January 31. The Fiscal Office handles anywhere between 63,000 and 74,000 license applications and renewals. A license costs $20, and there is a $20 late fee for belated renewals. A majority of the applications come in the form of paper applications sent in by residents. The registration process is preceded by a targeted mailing sent to all existing dog license holders. Gregory's department is charged with processing the mountain of paperwork each year and ensuring that an electronic database is maintained for the Fiscal Office and other departments within the county. The county maintains an animal shelter that depends on the dog license database for both revenue and to assist the citizens of the county.

{¶ 4} After the registration period closes, the animal shelter, in conjunction with General Services, conducts a nonrenewal campaign based on the previous year's records. Essentially, the nonrenewal campaign is looking for registration information on dog licenses issued the previous year that were not renewed in the current year's registration process. The animal shelter stands to lose significant revenue through the inability to conduct the nonrenewal campaign from both the

lost fee for the dog license itself and also from the $20 late-registration penalty that accompanies the belated registration. Further, the lack of renewals impedes the animal shelter's enforcement obligations and its ability to assist county residents. In 2016, there were over 15,000 nonrenewed registrations from the 2015 licensing year.

{¶ 5} When Gregory took charge of the dog license program and database, the animal shelter was able to conduct a nonrenewal campaign for the first couple of years. However, starting in 2010, the dog license database was not updated in sufficient time for the nonrenewal campaign to be processed before the next year's registration process began.[1]

{¶ 6} Although Gregory's performance evaluations were largely mediocre (generally indicating the need for improvement but also demonstrating that she met expectations in some categories), Gregory faced no disciplinary actions throughout her tenure with the county until January and February 2016, when Gregory received two formal reprimands. The first involved a dispute between her and Innis regarding one of Gregory's employees, who was dissatisfied with the manner in which certain jobs were divvied up by Gregory. Gregory told Innis something to the effect of "no one is going to tell me how to run General Services," and Innis initiated a reprimand for insubordination. There is a dispute as to whether Gregory was

---

[1] Why the county has not implemented an online registration process for dog owners is unclear to this panel. In any event, the lack of an automated renewal system has no bearing on this case.

directing that commentary at Innis or at the employee who first lodged a complaint against Gregory.

{¶ 7} The second reprimand resulted from Gregory's not responding to emails, in a few of which Innis requested that Gregory provide weekly reports or updates. Gregory claimed that a switch in the county's Outlook email application resulted in her not receiving notices of new emails. The specific email request for the weekly reports was sent on January 5, 2016, however, and Gregory had not responded or provided the requested information as of January 25th when the reprimand was issued. In addition, the second reprimand noted that Gregory had approved four refund vouchers totaling $80 in January 2016. Although Gregory had been authorized to approve the vouchers in the past, the policy had changed in the previous September and memoranda explaining the policy decision were emailed in September and November 2015. In the prehearing disciplinary conference, Gregory admitted that she was unaware of the policy because she had merely skimmed the relevant emails. At the hearing, it was noted that Gregory claimed that she did not believe the policy applied to her.

{¶ 8} The second reprimand for inappropriately approving the vouchers led to a five-day suspension that was enforced on nonconsecutive workdays in April 2016 — April 12 (Tuesday), 13 (Wednesday), 14 (Thursday), 19 (Tuesday), and 20 (Wednesday). The suspension letter unambiguously delineated the days for which Gregory was suspended. The county uses the nonconsecutive suspension for suspensions carrying over a weekend so that the employee does not obtain an

extended period of time off when serving the sanction. Gregory did not show up for work or call in her absence on April 15 (Friday) or 18 (Monday), although she called in on April 19 and 20. By the time she called in on days that she was suspended, Gregory had already violated the call-in procedure on two consecutive work days — a major infraction. In her defense, Gregory claimed that she must have misread the suspension letter or merely presumed her suspension was imposed on consecutive work days starting on April 12.

{¶ 9} On February 18, 2016, Gregory took a preplanned and approved leave of absence, in part explaining why the suspension for the second reprimand was served in April. While she was on leave, Innis took over the dog license registration process. The following day, Innis discovered 15,000 dog license applications in a back room of the General Services department. The checks totaling $318,420 were deposited, but the information on the applications had not been entered into the system. No one had made Innis aware of the applications, but upon discovery, Innis recruited additional volunteers to enter the information into the database — Gregory generally recruited some volunteers to help with the data processing obligations, but not as many as Innis used to clear the backlog. Gregory claimed that those 15,000 applications would be processed later in time, per the procedures typically followed by the department; however, Innis was not made aware of the backlog of applications that required entry into the database. Innis's processing of the 2016 backlog resulted in the animal shelter being able to conduct the nonrenewal campaign for the first time since 2010.

**{¶ 10}** The manager of the animal shelter, Mindy Naticchioni, discovered a problem in attempting to process the nonrenewal campaign. In May 2016, Naticchioni reviewed 15,470 records in the dog license database last updated during the 2015 registration process and that had not been renewed in the 2016 registration campaign. Naticchioni discovered that well over half of the nonrenewed licenses had a response of "null" or "blank" in the field where the name of the city should have been entered for the address of the dog owner. This meant that the renewal notices sent out ahead of the 2016 registration drive did not reach the intended destinations. Naticchioni spearheaded an effort to correct the deficiencies by inputting the appropriate city into the address field — demonstrating that the database could be updated with information within the county's possession. Gregory admitted that she instructed her employees to enter "unknown" into the city field during the data-entry phase of the registration process during the time-sensitive period of the initial application season, but claimed that the erroneous entries would be corrected during the summer months after the dog license registration process tapers off. Gregory's predecessor confirmed that was supposed to be the process.

**{¶ 11}** Nevertheless, Gregory maintained that the issues with the data entry that Naticchioni discovered were a product of Innis's employing untrained volunteers to input the applications received during the 2016 registration process. The hearing officer discounted Gregory's argument because it is undisputed that Gregory was in charge of the 2015 registration process at which time the entries at

issue would have been created and that Gregory was responsible for updating the database during the 2015 calendar year. Gregory also conceded that it was her responsibility to correct the database, when possible, if applications supplied incorrect or missing information.

**Commission's Conclusion**

{¶ 12} The hearing officer concluded that the two grounds for Gregory's removal from her position were egregious, flagrant, or willful neglect in the performance of assigned duties and the failure to complete legitimate job assignments. Although the dog license registration process and updating the database had remained the same over the relevant time period, Gregory (for the first two years she held the position) and her predecessor were able to update the dog license database after the December-January registration process in a timely manner that permitted the animal shelter to conduct a nonrenewal campaign in the summer months to ensure that all dog owners were in compliance with the law. Innis, albeit through the recruitment of additional volunteers to clear the backlog of the 15,000 applications discovered in the storage closet, also used the same procedures and was able to complete the initial data entry to permit the nonrenewal campaign.

{¶ 13} As an additional explanation of the egregious finding, the hearing officer cited Gregory's failure to adequately update the 2015 dog license database and her consistent failure to read and respond to emails. Of the over 15,000 nonrenewals from the 2015 registration process, over half of the entries lacked an

actual city in the address field. Gregory admitted that she instructed her staff to enter "unknown" as a temporary measure; however, in light of the undisputed fact that half of the 15,000 entries were never updated, the hearing officer concluded that Gregory failed to institute a process to ensure that the temporary measure was corrected. And further, Gregory's systemic issues with responding or reading emails was largely undisputed — Gregory's only defense to her failure to respond to emails for over three weeks was that the county updated its email system and she no longer received notice of the new emails.

{¶ 14} And finally, the hearing officer concluded that Gregory violated the county policy with respect to the call-in procedure on two consecutive work days based on the undisputed evidence. Gregory did not contest the underlying fact; she only offered an excuse as to how the failure occurred.

{¶ 15} In light of those findings substantiating the removable and major infractions, the hearing officer recommended that Gregory's termination from her position be upheld. The Commission adopted the hearing officer's report and recommendation. Gregory appealed the Commission's decision to the trial court under R.C. Chapter 2506.

**Trial Court's Standard of Review**

{¶ 16} "A common pleas court has jurisdiction to review final orders issued by 'any officer, tribunal, authority, board, bureau, commission, department, or other division of any political subdivision of the state.'" *Shelly Materials, Inc. v.*

*Streetsboro Planning & Zoning Comm.*, Slip Opinion No. 2019-Ohio-4499, ¶ 12,[2] quoting R.C. 2506.01(A).  The trial court, under this review process, essentially acts as an appellate court, and "'may find that the order, adjudication, or decision is unconstitutional, illegal, arbitrary, capricious, unreasonable, or unsupported by the preponderance of substantial, reliable, and probative evidence on the whole record.'" *Id.*, quoting R.C. 2506.04.  Each ground of the disjunctive list must be read to have a distinct meaning.  *Id.*, citing *Freedom Rd. Found. v. Ohio Dept. of Liquor Control*, 80 Ohio St.3d 202, 205, 1997-Ohio-346, 685 N.E.2d 522.

{¶ 17} Under the trial court's standard of review, the "'court weighs the evidence to determine whether a preponderance of reliable, probative, and substantial evidence supports the administrative decision, and if it does, the court may not substitute its judgment for that of' the administrative agency." *Id.* at ¶ 13, quoting *Independence v. Office of the Cuyahoga Cty. Executive*, 142 Ohio St.3d 125, 2014-Ohio-4650, 28 N.E.3d 1182, ¶ 13. However, the trial court "may not 'blatantly substitute its judgment for that of the agency, especially in areas of administrative expertise.'" *Dudukovich v. Lorain Metro. Hous. Auth.*, 58 Ohio St.2d 202, 207, 389 N.E.2d 1113 (1979).

---

[2] Although *Shelly Materials* is a plurality decision with no binding authority, none of the dissenting justices took issue with the black letter standard of review as announced in the lead opinion.  The issue driving the split decision was focused on the particularities of the administrative appeal in that case, which included a clear and convincing standard that is not applicable in this case.  Justice Stewart authored the plurality decision, joined by Justices Kennedy and Donnelly.  Justice Fischer concurred in judgment only with Justice Stewart's decision.  Justice DeWine authored the dissent, joined by Chief Justice O'Connor and Judge William Zimmerman, of the Third District Court of Appeals, who was sitting by assignment for Justice French.

**{¶ 18}** Before addressing the trial court's conclusions, it bears noting that the incorrect standard of review was cited below, and that standard carried into the appellate briefing. The trial court favorably quoted *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 111, 407 N.E.2d 1265 (1980), for the proposition of law that

> In R.C. Chapter 2506 appeals, determining whether the [Commission's] Final Order is supported by reliable, probative, and substantial evidence essentially is a question of the absence or presence of the requisite quantum of evidence.
>
> "Although this in essence is a legal question, inevitably it involves a consideration of the evidence, and to a limited extent would permit a substitution of judgment by the reviewing Common Pleas Court. In undertaking this hybrid form of review, the Court of Common Pleas must give due deference to the administrative resolution of evidentiary conflicts; [sic] however, the findings of the agency are by no means conclusive."

*Id.*[3] *Conrad* involves an R.C. Chapter 119 appeal to the trial court, in which "the common pleas court must give deference to the agency's resolution of evidentiary conflicts." *Bartchy v. State Bd. of Edn.*, 120 Ohio St.3d 205, 2008-Ohio-4826, 897

---

[3] The quotation contained an undesignated omission. The full quotation is as follows:

> Although this in essence is a legal question, inevitably it involves a consideration of the evidence, and to a limited extent would permit a substitution of judgment by the reviewing Common Pleas Court.
>
> In undertaking this hybrid form of review, the Court of Common Pleas must give due deference to the administrative resolution of evidentiary conflicts. *For example, when the evidence before the court consists of conflicting testimony of approximately equal weight, the court should defer to the determination of the administrative body, which, as the fact-finder, had the opportunity to observe the demeanor of the witnesses and weigh their credibility.* However, the findings of the agency are by no means conclusive.

(Emphasis added.) *Id.*

N.E.2d 1096, ¶ 37, citing *Conrad*.[4]  Unlike R.C. Chapter 119 appeals, in reviewing R.C. Chapter 2506 appeals, the trial court "weighs the evidence to determine whether a preponderance of reliable, probative, and substantial evidence supports the administrative decision."  *Shelly Materials, Inc.*, Slip Opinion No. 2019-Ohio-4499, at ¶ 13.  The court does not presumptively give deference to the agency's resolution of the evidentiary conflicts.

{¶ 19} Thus, although both sections of the Revised Code provide similar standards of review, the starting bases of the inquiries differ.  For this reason, the trial court's reliance on *Conrad* as the standard of review for an R.C. Chapter 2506 appeal was misplaced.  Nonetheless, and in light of the trial court's conclusion to independently weigh the evidence, any error in misstating the standard of review would be harmless.

**Trial Court's Decision**

{¶ 20} The trial court, upon conducting its review of the administrative record, concluded that (1) Gregory followed the same procedure for the annual registration program as had been in place by her predecessor; (2) that the animal shelter's ability to conduct the renewal campaign based on the untimely entry of information was "not the proper benchmark" because the animal shelter and the general services department used the database for different purposes; (3) that there was a "complete failure on the part of management" to communicate deadlines and

---

[4] As noted with respect to *Shelly Materials*, although *Bartchy* is a plurality decision with no binding authority, none of the dissenting justices took issue with the black letter standard of review as announced in the lead opinion.

job requirements to Gregory; (4) that Naticchioni was not an "expert in databases" for the basis of her conclusion that half of the over 15,000 2015 dog license entries lacked a city information in the address field; (5) that not all entries could be corrected and that it was impossible to determine where the errors came from; (6) that Gregory was not provided training, progressive discipline, or a meeting to discuss "the best way to handle the issue of timely updating" the database; and (7) that because there was no evidence that Gregory intended to miss work, there was no pattern of disregarding the call-in procedures.

{¶ 21} According to the trial court, those conclusions demonstrated that the Commission's order affirming Gregory's termination from employment was unsupported by the preponderance of substantial, reliable, and probative evidence.

{¶ 22} The county timely appealed the trial court's decision.

**Discussion**

{¶ 23} Our review of the trial court's decision is more limited than the trial court's standard of review. *Shelly Materials, Inc.*, Slip Opinion No. 2019-Ohio-4499, at ¶ 17, quoting *Kisil v. Sandusky*, 12 Ohio St.3d 30, 34, 465 N.E.2d 848 (1984). "A party who disagrees with a decision of a court of common pleas in an R.C. Chapter 2506 administrative appeal may appeal that decision to the court of appeals but only on 'questions of law.'" *Id.* In addition, we can review whether the trial court "abused its discretion in deciding that an administrative order was or was not supported by reliable, probative, and substantial evidence." *Id.*, citing *Boice v. Ottawa Hills*, 137 Ohio St.3d 412, 2013-Ohio-4769, 999 N.E.2d 649, ¶ 17, and *Kisil*

at 34. "In this context, a reversal 'as a matter of law' can occur only when, having viewed the evidence most favorably to the decision, there are no facts to support the common pleas court decision." *Kurutz v. Cleveland*, 8th Dist. Cuyahoga No. 105899, 2018-Ohio-2398, ¶ 8.

{¶ 24} It must be briefly noted that the plurality decision in *Shelly Materials* has no precedential value in light of the fact that only three justices joined in the conclusion that "the court of appeals [in *Shelly Materials*] had no authority to second-guess the decision of the court of common pleas on questions going to the weight of the evidence supporting the commission's findings." *Id.* at ¶ 21. The plurality concluded that the court of appeals incorrectly weighed the evidence contrary the limitations imposed under R.C. 2506.04. It was expressly recognized that the appellate court in *Shelly Materials* had acknowledged that the case hinged on the credibility of the expert's testimony at the hearing level — a matter almost entirely reserved to the trial court within the framework of R.C. Chapter 2506. *Id.* at ¶ 23.

{¶ 25} The plurality, however, also recognized that an appeal from the trial court's review of an administrative decision under R.C. 2506.04 goes beyond the weight-of-the-evidence review (through which the court of appeals can determine whether the court of common pleas abused its discretion in deciding that an administrative order was or was not supported by the requisite evidence); it also includes reviewing questions of law. *Id.* at ¶ 17. It is equally noteworthy that the dissent in *Shelly Materials* would have concluded that the trial court applied the

incorrect standard of review, but the court of appeals nonetheless erred by reinstating the commission's (agency's) decision. *Id.* at ¶ 39 (DeWine, J., dissenting.). According to the dissent, the matter should have been remanded to the trial court to apply the correct standard of review in the first instance. *Id.*

{¶ 26} In reading *Shelly Materials* to its fullest extent, while at the same time acknowledging that it was a fractured decision, we must review whether the trial court applied the correct standard of review to the administrative agency's decision. If there is any takeaway from *Shelly Materials*, it is this: the one legal conclusion agreed upon by a majority of the justices in *Shelly Materials* is that a party aggrieved by a decision of a trial court in an R.C. Chapter 2506 administrative appeal may appeal that decision to the court of appeals on questions of law. *Shelly Materials* at ¶ 17, 39. Six justices agreed with that proposition of black letter law. *See id.* The question before us does not address the weight of the evidence, which we would be reviewing for an abuse of discretion, but instead, the county posits that the trial court applied the incorrect standard of review — a question of law and an issue well beyond the scope of the plurality opinion in *Shelly Materials*. *See id.* at ¶ 21 (recognizing that the only issue preserved was limited to the weight of the evidence in support of the agency's and the trial court's conclusions).

### The Trial Court's Review Exceeded the Scope of Its Review

{¶ 27} The trial court exceeded the scope of its review in several respects and thereby erred in reversing the Commission's decision. For example, the hearing officer concluded, based on Section 13.08 of the county's personnel policies and

procedures manual, that Gregory committed a "major infraction" by failing to follow call-in procedures on two consecutive work days. The trial court fundamentally disagreed with that policy, claiming that Gregory's failure to follow the call-in procedures was a "mistake" and that there was "certainly not a pattern of disregarding call-in procedures" such that Gregory's infraction should not have resulted in or formed the support of her removal.

{¶ 28} The trial court has no authority to determine the severity of the county's infraction system that is set forth in the personnel policies and procedures manual. The policies and procedures manual created a policy that escalated the severity of the failure to follow call-in procedures — one day was a minor infraction, two days was a major infraction, and three days was a removable infraction. Nothing in that procedure requires the county to prove that the employee willfully disregarded the procedures or demonstrated a pattern of failures to follow the procedures. It is for this reason that the court was able to find an absence of evidence demonstrating Gregory's intent or pattern of misconduct — the employer bore no burden to produce any such evidence because the standard for failing to follow the call-in procedures was, for all intents and purposes, a strict liability standard.

{¶ 29} The sole question before the trial court was whether a preponderance of the evidence demonstrated that Gregory's conduct amounted to a "major infraction," and the evidence was undisputed on that point — Gregory conceded that she failed to follow the call-in procedure for two consecutive work days. In essence, the trial court made a policy decision limiting the severity of the call-in infractions

contrary to the employer's own policies and procedures manual. This is beyond the scope of the administrative review process, which is limited to determining whether a preponderance of the evidence supports the conclusion — in this case that the employee violated the call-in procedure on two consecutive days.

{¶ 30} Along those lines, the trial court also concluded that the county was required to progressively discipline Gregory before taking steps to remove her for the conduct that constituted the basis of the "removable infractions." The hearing officer did not address this aspect of the policies and procedures manual, and in fact, the employer's policies and procedures manual expressly establishes that the "progressive discipline program" does not apply to an offense deemed "removable," such as the offense for which Gregory was terminated. There is no evidence in the record demonstrating that Gregory was subject to progressive discipline because Gregory was not entitled to invoke the progressive discipline policy based on the severity of alleged infractions.

{¶ 31} The trial court's conclusion, that the county failed to progressively discipline Gregory before her removal, exceeded the trial court's scope of review — it again insinuated that the county require a policy or procedure that was contrary to the employer's own policies and procedures manual. *See Kurutz*, 8th Dist. Cuyahoga No. 105899, 2018-Ohio-2398, at ¶ 19. The only issue before the trial court was whether the two major infractions and one removable infraction — the basis of Gregory's removal — were supported by a preponderance of the evidence in the

record. The trial court lacked authority to conclude that the county was required to implement progressive disciplinary procedures for a "removable infraction."

{¶ 32} With respect to the trial court's conclusion that the county did not produce a preponderance of evidence supporting the "removable infraction" of egregious, flagrant, or willful neglect in the performance of assigned duties, the trial court found that the failure to maintain the database and failure to timely conclude the data-entry process did not rise to this level. On this issue, the trial court concluded that Gregory had followed the same procedures as her predecessor, that the animal shelter's inability to conduct a renewal campaign was "not the proper benchmark," that there was a complete failure to communicate deadlines and requirements to Gregory by management, and that Naticchioni was not an "expert in databases" so that her testimony of finding half of the 2015 dog license entries that were not renewed in 2016 to be lacking a "city" in the address field was unreliable.

{¶ 33} None of the trial court's conclusions address the weight of underlying evidence in support of the Commission's decision. It is unclear why the animal shelter's inability to conduct a nonrenewal campaign was not the "proper benchmark" for Gregory's performance standards. According to the trial court, the animal shelter's primary objectives are dependent on an up-to-date database that was managed by Gregory.

{¶ 34} The hearing officer concluded that Gregory failed to update the 2015 dog license database during the 2015 calendar year, based on Naticchioni's

testimony that she reviewed over 15,000 nonrenewed dog license entries after the initial 2016 campaign. Of those 15,000 entries, over half lacked a "city" in the address field. It is undisputed that Gregory was responsible for ensuring that the 2015 dog license application information was entered into the database, and Gregory conceded that she was responsible for updating the database information after the initial period of data entry ended, the procedure used by her predecessor. Naticchioni reviewed the 2015 information and found a systematic failure to input the basic address information. Despite this evidence, the trial court concluded that "there is insufficient evidence in the record before the Court to fault Gregory for neglect of duty based on the testimony of a layperson such as Naticchioni" because Naticchioni could not "pinpoint" the one person or department that erroneously entered the information due to her lack of expertise in databases.

{¶ 35} It is not at all apparent why the employer would need an expert to ascertain whether a "city" is included in the address field in the database its employees maintain and use as part of their day-to-day employment obligations. Most important, Naticchioni's status as a fact witness was not challenged at the agency level. Thus, the trial court's conclusion that the employer failed to demonstrate that Naticchioni was an expert in the database went beyond the court's scope of review. There was no evidence demonstrating Naticchioni to be an expert in the database solely because Gregory failed to challenge her testimony at the agency level on such grounds. Since her testimony was not challenged, the employer bore no burden in proving her to be an expert.

**{¶ 36}** Further, the trial court heavily relied on the fact that the county failed to demonstrate which employee specifically inputted the address into the database without a complete address. According to the hearing officer's report and recommendation, however, the reason for the omission was irrelevant — there was never an attempt to prove that Gregory herself was the cause of, or to otherwise "pinpoint" the persons responsible for, the errors. The hearing officer's conclusion was that Gregory failed to establish procedures for her employees to ever update the 2015 information. Thus, the trial court interjected a factual issue — which particular employee was responsible for each of the erroneous entries — that was not considered or resolved by the Commission and that did not form the basis of the Commission's final decision.

**{¶ 37}** Gregory admitted that she instructed her employees to enter "unknown" into the city field during the time-sensitive period of the initial data-entry process. Gregory also acknowledged that the erroneous entries should be corrected during the summer months after the initial dog license registration process tapers off. According to Naticchioni's testimony, the 2015 information was never updated, but Naticchioni was able to update the information through information readily available to county employees. The trial court did not address whether the preponderance of the evidence supported the Commission's decision to uphold Gregory's termination from employment, but rather, the trial court inserted factual issues that were not reviewed at the agency level. At the risk of belaboring the point, there was no evidence of which employee actually incorrectly inputted the

"null" or "blank" city in the address field because that was not the issue; the issue was Gregory's failure to ensure that the database was corrected during the 2015 calendar year.

{¶ 38} And most importantly, the trial court did not address the second finding by the hearing officer, as adopted by the Commission, that Gregory's repeated failure to read and respond to emails reflected on her attention to details and the consistent disregard of the emails constituted an egregious, flagrant, or willful neglect of Gregory's duties that would also support Gregory's removal from her position. In other words, the trial court failed to conduct a complete review of the administrative agency's decision — the second finding also substantiated the conclusion to uphold Gregory's termination.

**Conclusion**

{¶ 39} Although trial courts must weigh the evidence to determine whether a preponderance of reliable, probative, and substantial evidence supports the administrative decision, a trial court may not substitute its judgment for that of the administrative agency. In light of the foregoing, the trial court crossed that boundary and its decision substituted its judgment for that of the Commission. In this case, the trial court instituted policy requirements contrary to the express provisions of the county's policies and procedures manual and discussed factual issues beyond what was considered by the Commission in reversing the Commission's decision to uphold Gregory's termination. Accordingly, the court exceeded the standard of its review, and thereby erred as a matter of law.

Notwithstanding the error, our review does not include the ability to review the evidence in reaching a conclusion as to the validity of the Commission's decision. Our review is limited to considering the trial court's decision, and as pertinent to our discussion, whether the trial court applied the correct standard of review.

{¶ 40} Accordingly, we reverse the decision of the trial court and remand for further proceedings in which the trial court must review the Commission's decision under the standard of review as concisely presented in *Shelly Materials, Inc.*, Slip Opinion No. 2019-Ohio-4499, at ¶ 13. Reversed and remanded.

It is ordered that appellant recover of said appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
SEAN C. GALLAGHER, PRESIDING JUDGE

FRANK D. CELEBREZZE, JR., J., CONCURS;
MICHELLE J. SHEEHAN, J., DISSENTS WITH SEPARATE OPINION

MICHELLE J. SHEEHAN, J., DISSENTING:

{¶ 41} Respectfully, I dissent. In my view, whether Gregory's conduct relating to her management of the dog license database rose to the level of egregious, flagrant, or willful neglect in performing her duties warranting a removal is a

question concerning the weight of the evidence. As the Supreme Court of Ohio recently reminded us in *Shelly Materials,* Slip Opinion No. 2019-Ohio-4499, an appellate court plays a different role than the court of common pleas in an administrative appeal pursuant to R.C. Chapter 2506. While the trial court is authorized to examine and weigh the evidence, our role is limited to reviewing whether the lower court abused its discretion in deciding an administrative order was (or was not) supported by reliable, probative, and substantial evidence. Mindful of our limited role, I find the trial court applied the proper standard of review and acted within its discretion in finding the county's removal of Gregory, a 23-year employee, was not supported by reliable, probative, and substantial evidence.

{¶ 42} It is undisputed the standard of review governing this appeal is set forth in the recent Supreme Court of Ohio decision, *Shelly Materials*. Regarding the trial court's review of an administrative appeal pursuant to R.C. Chapter 2506, the Court noted that, while such a review is not de novo, it resembles a de novo proceeding. *Shelly Materials* at ¶ 13, citing *Kisil v. Sandusky*, 12 Ohio St.3d 30, 34, 465 N.E.2d 848 (1984). This means that the trial court "'weighs the evidence to determine whether a preponderance of reliable, probative, and substantial evidence supports the administrative decision, and if it does, the court may not substitute its judgment for that of' the administrative agency." *Id.*, quoting *Independence v. Office of the Cuyahoga Cty. Executive*, 142 Ohio St.3d 125, 2014-Ohio-4650, 28 N.E.3d 1182, ¶ 13. This standard of review, however, also means the trial court has "'the power to examine the whole record, make factual and legal determinations, and

reverse the [administrative agency's] decision if it is not supported by a preponderance of substantial, reliable, and probative evidence.'" *Id.*, quoting *Cleveland Clinic Found. v. Cleveland Bd. of Zoning Appeals*, 141 Ohio St.3d 318, 2014-Ohio-4809, 23 N.E.3d 1161, ¶ 24.

{¶ 43} Preponderance of the evidence means the greater weight of the evidence. *Dawson v. Anderson*, 121 Ohio App.3d 9, 13, 698 N.E.2d 1014 (10th Dist.1997); *Weishaar v. Strimbu*, 76 Ohio App.3d 276, 283, 601 N.E.2d 587 (8th Dist.1991). In *Hale v. Bd. of Edn.*, 13 Ohio St.2d 92, 96-97, 234 N.E.2d 583 (1968), the Supreme Court of Ohio noted that when adopting R.C. 2506.04 in 1957, the General Assembly employed the words "preponderance of * * * evidence" to signal its intent that the common pleas court is to weigh evidence in administrative appeals.

{¶ 44} "'[D]etermining whether an agency order is supported by reliable, probative and substantial evidence is essentially a question of the absence or presence of the requisite quantum of evidence.'" *Kisil* at 35, quoting *Univ. of Cincinnati v. Conrad*, 63 Ohio St.2d 108, 111, 407 N.E.2d 1265 (1980). "'Although this in essence is a legal question, inevitably it involves a consideration of the evidence, and to a limited extent would permit a substitution of judgment by the reviewing Common Pleas Court.'" *Id.*, quoting *Conrad* at 111.

{¶ 45} While the trial court's review resembles a de novo proceeding, the review to be undertaken by the court of appeals is much more limited in scope. *Kisil,* 12 Ohio St.3d at 34, 465 N.E.2d 848. R.C. 2506.04 gives the common pleas court

power to weigh the evidence and to reverse the administrative body where its decision is not supported by the preponderance of substantial, reliable, and probative evidence, but grants "a more limited power to the court of appeals to review the judgment of the common pleas court only on 'questions of law,' which does not include the same extensive power to weigh 'the preponderance of substantial, reliable, and probative evidence,' as is granted to the common pleas court." *Kisil* at 34, fn.4.

{¶ 46} Summarizing its precedents, the Supreme Court of Ohio in *Shelly Materials,* Slip Opinion No. 2019-Ohio-4499*,* again cautions us of the limited role played by the court of appeals in an administrative appeal pursuant to R.C. Chapter 2506.

> A party who disagrees with a decision of a court of common pleas in an R.C. Chapter 2506 administrative appeal may appeal that decision to the court of appeals but only on "questions of law." R.C. 2506.04. For this reason, we have stated that under R.C. 2506.04, an appeal to the court of appeals is "more limited in scope" than was the appeal to the court of common pleas. While the court of common pleas is required to examine the evidence, the court of appeals may not weigh the evidence. Apart from deciding purely legal issues, the court of appeals can determine whether the court of common pleas abused its discretion, which in this context means reviewing whether the lower court abused its discretion in deciding that an administrative order was or was not supported by reliable, probative, and substantial evidence.

(Citations omitted.) *Shelly Materials* at ¶ 17.

{¶ 47} The trial court in *Shelly Materials* found the Planning and Zoning Commission's decision was not supported by a preponderance of substantial, reliable, and probative evidence. The court of appeals reversed the trial court's

decision. Emphasizing that the trial court acted within the scope of review under R.C. Chapter 2506 when it weighed the evidence differently than the Commission, *id.* at ¶ 21, the Supreme Court of Ohio reversed the court of appeals.

{¶ 48} In this case, there were three infractions cited for Gregory's removal pursuant to Section 13.08 of the county's Employee Conduct Policy ("Inappropriate Conduct/Grounds for Discipline"). The hearing officer concluded that all three infractions were proven. The first infraction was "egregious, flagrant or willful neglect in the performance of assigned duties" (a conduct relating to "neglect of duty, insufficiency, and incompetence" and constituting a removable infraction); the second infraction was a "failure to complete a legitimate job assignment" (a conduct also relating to "neglect of duty, insufficiency, and incompetence" and constituting a major offense); and the third infraction was her failing to follow the call-in procedures for two consecutive days (a conduct also relating to "neglect of duty, insufficiency, and incompetency" and constituting a major infraction).

{¶ 49} Although the hearing officer found the county proved all three infractions, he acknowledged that the first infraction and the second infraction were both predicated on Gregory's mismanagement of the dog license database. (Hearing Officer's Report, p. 29.)

{¶ 50} The trial court issued a detailed decision to support its reversal of the order of the county's Personnel Review Commission removing Gregory. After a careful review of the evidence, it concluded the Commission's order affirming Gregory's removal was not supported by the preponderance of substantial, reliable,

and probative evidence. Specifically, the trial court found an absence of reliable evidence in support of the hearing officer's conclusions that Gregory was removed for just cause for mismanaging the dog license database and for failing to follow call-in procedures for two consecutive days.

{¶ 51} Regarding the dog registration program, the trial court found that the preponderance of the evidence showed that Gregory followed the same process and procedure for the annual dog registration and data entry work put into place by her predecessor, pre-Charter Director Lula Hamilton. The trial court specifically referred to the testimony from Hamilton, Innis, and General Services employees Sarah Watkins and Louis Bucci to support this finding. Because of the high volume of applications received each year, additional county workers were always needed to work on the applications even when the department had eight employees. Hamilton's policy was always "Process first, data entry second." Because the dog license number is on the application, the information about a lost dog can be manually looked up even if the information has not been entered into the database yet.

{¶ 52} Regarding the County Kennel's inability to run a nonrenewal campaign due to the lack of an up-to-date database, the trial court reasoned that Gregory alone cannot be faulted for General Services' inability to timely update the database. Gregory was following the same process put in place by Hamilton and had never been directed by a supervisor to follow a different procedure. The trial court found that the fact that the County Kennel could not conduct a nonrenewal

campaign did not equate to Gregory not performing her job or mishandling the database because General Services is focused on its statutory duty to process the dog license applications before updating the database. The trial court reasoned that, if having an up-to-date database was such an important part of Gregory's duty, Innis would have the responsibility to direct her and provide her with necessary human resources to complete the task timely. The court determined that there was "a complete failure on the part of management to communicate any deadlines or requirements for Gregory to fulfill her job duties regarding managing" the dog license database.

{¶ 53} The trial court noted that the hearing officer relied heavily on the testimony of Naticchioni, the County Kennel Manager. She testified to the errors in the database based on her personal review of the database and concluded Gregory mishandled the database. The trial court observed that Naticchioni is not an expert in computer database and she never reviewed the applications to determine the *cause* of the errors in the database. The trial court pointed to Hamilton's remark of "garbage in, garbage out" in reference to the possibility that the errors may be created by people inputting the data, including other county employees and the dog owners who register online. The trial court concluded Naticchioni's testimony did not constitute sufficient reliable evidence to support Gregory's alleged neglect of duty.

{¶ 54} The trial court also noted that, while Naticchioni had raised the issue of the necessity of an up-to-date database with Eric Richter and had also

communicated her dissatisfaction with the database to Innis, Naticchioni never raised her concerns directly with Gregory. The trial court noted that "[t]here was no training, progressive discipline, or even a meeting with Gregory to discuss the best way to handle the issue of timely updating [the dog license database]."

{¶ 55} Citing these reasons, the trial court concluded that any deficiency regarding Gregory's management of the dog license database "could not be an egregious failure or willful neglect of assigned job duties on Gregory's part." In other words, after weighing the evidence, which was within the trial court's scope of review, the trial court determined there was a lack of preponderance of reliable evidence showing Gregory's performance of her job relating to the management of the dog license database rose to the level of *egregious* or *willful* conduct warranting a "removable infraction" designation.

{¶ 56} Regarding the second basis for Gregory's removal — her failure to follow the call-in procedures after being suspended — the trial court stated that non-consecutive suspension, while permissible, was not "intuitive." The court characterized Gregory's failure to call in or show up for work on the two non-suspended days as nothing more than a mistake. The trial court determined that there was no evidence that Gregory, a 23-year county employee without any prior discipline regarding call-in procedures, intentionally disregarded the procedures.

{¶ 57} Although Gregory's failure in following the call-in procedure for two consecutive days was deemed a "major" infraction pursuant to section 13.08 of the county's Employee Conduct Policy (and it appears the Conduct Policy does not allow

for a consideration of any mitigating circumstances), Innis testified that Naticchioni's April 26, 2016 letter to Fiscal Officer Dennis Kennedy complaining of Gregory's management of the dog license database was the catalyst for Gregory's removal. (Hearing Officer's Report, p.11.)

{¶ 58} Thus, whether the county proved Gregory committed a "major" infraction in falling to call in for two consecutive days is not relevant. The only issue in this case is whether the trial court abused its discretion in finding Gregory's removal was not supported by the preponderance of substantial, reliable, and probative evidence. The trial court was permitted to weigh all the evidence cited in support of her removal and was within its discretion in assigning less weight to Gregory's failure of following the call-in procedure for two consecutive days — albeit its classification as a "major" infraction — in reversing the Commission's order removing Gregory.

{¶ 59} Here, the record shows that, after a thorough examination of the evidence, the trial court found an absence of the requisite quantum of evidence showing Gregory was removed for just cause. Gregory followed the procedure and policy set forth by her predecessor in managing the dog license database. While it was undisputed that the County Kennel relied on an up-to-date and accurate database to perform its work and that the Kennel was unable to use the database to run the nonrenewal campaign, the trial court found there was a lack of preponderance of reliable, probative, and substantial evidence — other than the County's assertion — establishing that Gregory, rather than her supervisor(s), was

responsible for instituting an improved procedure regarding the data entry work and the database.

{¶ 60} Instead, the trial court found the evidence showed Gregory had not received directives or guidance from a supervisor requiring her to alter the existing policy or procedure; neither had Gregory been given specific deadlines for the data entry work for purposes of facilitating the County Kennel's nonrenewal campaign. After the Kennel Manager Naticchioni raised her concerns with the Fiscal Officer in April 2016, Gregory was soon placed on administrative leave in May 2016 and terminated in June 2016. The trial court noted that there was "no training, progressive discipline, or even a meeting with Gregory" to discuss the best way to handle the issue of timely updating the dog license database. While progressive discipline is applicable only to infractions that are less severe than those categorized as "removable" (such as "egregious, flagrant or willful neglect in the performance of assigned duties"), the trial court found Gregory's conduct did not rise to the level of "egregious, fragrant or willful neglect" and therefore not a "removable" infraction. Progressive discipline would also be applicable as to her second infraction, which was "failing to complete a legitimate job assignment," not a "removable" offense.

{¶ 61} This appeal concerns the weight of the evidence. The trial court acted within its scope of review in weighing the evidence differently than the Commission. While the common pleas court is required to examine and weigh the evidence, the court of appeals "may not weigh the evidence." *Shelly Materials* at ¶ 17. Our role in the instant administrative appeal is different from that of the trial court. Within the

ambit of "questions" for appellate review, we are limited to determining whether the trial court abuses its discretion in deciding that an administrative order is not supported by reliable, probative, and substantial evidence. Under this limited and narrow scope of review, I would affirm the trial court's decision because the trial court did not abuse its discretion in reviewing the evidence and finding the Commission's removal of Gregory from her employment with the Fiscal Office was not supported by reliable, probative, and substantial evidence. For these reasons, I respectfully dissent.